Janice Lorrah, Montana Bar #213630
PACIFIC JUSTICE INSTITUTE
P.O. Box 3571
Wilmington, Delaware 19807
Telephone: (302) 379-7249
Email: jlorrah@pji.org

Matthew G. Monforton, Montana Bar # 5245
Monforton Law Offices, PLLC
32 Kelly Court
Bozeman, Montana 59718
Telephone: (406) 570-2949
Email: matthewmonforton@yahoo.com

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| TODD KOLSTAD, | ) |
| | ) Case No. CV 24-55-BLG-SPW-TJC |
| Plaintiff, | ) |
| | ) **COMPLAINT** |
| v. | ) |
| | ) |
| CYNDI BAILLARGEON, CRYSTAL WHITMORE; | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

COMES NOW Plaintiff Todd Kolstad, who brings this action against the above-named Defendants and alleges as follows:

## I. INTRODUCTION

1.      Around 9:00 p.m. on Friday, August 18, 2023, Plaintiff Todd Kolstad and Krista Cummins-Kolstad brought their 14-year-old daughter, H.K.,[1] to a hospital in Glasgow, Montana.  H.K. claimed to have poisoned herself.  The Kolstads knew her claim was false but still took her to the hospital.

2.      Blood tests showed no trace of poison.  Nevertheless, H.K. claimed she would attempt suicide if she returned home because she identified as a male and her parents, who were devout Christians, believed transgenderism was a sin.

3.      The Kolstads agreed to have H.K. referred to Billings Clinic Psychiatric Center in Billings, Montana. Billings Clinic stated on Saturday, August 19, that two persons were ahead of H.K. on its waiting list but that a bed would likely be available on Monday or Tuesday.

4.      The hospital, CPS, and the Kolstads agreed that, in the meantime, H.K. would receive 24-hour observation and remain safely hospitalized.

5.      The hospital made referrals to other Montana psychiatric facilities as well as ones in South Dakota and Wyoming. The Kolstads objected to placement in Wyoming, however, because that state allowed minors to obtain "gender-affirming" care without parental consent.

---

[1] H.K. will be referred to only by her initials.  Her name and date of birth have been redacted from all exhibits attached to this Complaint.

6.     Meanwhile, hospital staff in Glasgow referred to H.K. using a male name and male pronouns.  A nurse spoke to her about "top surgery," *i.e.*, the removal of healthy breasts in order to provide a masculine appearance. The Kolstads repeatedly told hospital staff and CPS that addressing their daughter as a male violated their religious beliefs.

7.     On Tuesday, August 22, Billings Clinic informed the hospital that H.K. had moved to the top of its waiting list and a bed would likely be available the following day.

8.     That evening, a different physician called the Kolstads to tell them that a psychiatric facility in Wyoming had a bed available.  He did not tell them the name of the facility or its location.  The Kolstads repeated their concerns about Wyoming and refused to sign paperwork allowing H.K. to be transferred.

9.     Approximately 15 minutes later, a CPS worker and a police officer arrived at the Kolstads' home and informed them that CPS had taken custody of H.K. and would transport her the Wyoming psychiatric facility against their wishes.  CPS also told the Kolstads that law enforcement would be notified if they attempted to contact their daughter.

10.    This seizure violated due process because "seizing a child without a warrant is excusable only when officials have reasonable cause to believe that the child is likely to experience serious bodily harm in the time that would be required

to obtain a warrant." *Kirkpatrick v. County of Washoe*, 843 F.3d 784, 790 (9th Cir. 2016). H.K. was not in any danger of serious bodily harm when CPS seized her. Instead, she was in a hospital under 24-hour observation.

11.     Three days later, CPS workers committed a separate constitutional violation. Under the Fourteenth Amendment, "parents and children have a right to be free from judicial deception in child custody proceedings and removal orders." *David v. Kaulukukui*, 38 F.4th 792, 800 (9th Cir. 2022).

12.     CPS workers falsely testified in an affidavit filed in state court that H.K. faced an "imminent risk of physical harm" when they seized her even though they knew she was safe and under 24-hour observation in a Glasgow hospital.

13.     Along with inserting false statements in the affidavit, CPS workers omitted from the affidavit all references to the Kolstads' religious beliefs. This omission was material because, under Montana law, a finding of child neglect cannot occur "for the sole reason that a parent or legal guardian, because of religious beliefs, does not provide adequate health care for a child." Mont. Code Ann. § 41-3-102(4)(b).

14.     The Kolstads' religious-based objection to placing H.K in a Wyoming psychiatric facility, therefore, did not constitute "neglect" under Montana law.

15.    Days after seizing H.K., CPS workers filed the affidavit in state court, which then granted CPS emergency custody of H.K.  The state court would not have done so if CPS workers had testified truthfully.

16.    CPS workers committed these egregious acts because they believed the Kolstads' objections to transgenderism made them unfit parents.

17.    After seizing H.K., CPS told the Kolstads that they would not regain custody of their daughter unless they accepted her transgenderism.

18.    When the Kolstads refused to compromise their faith, CPS sent H.K. to her biological mother in Canada even though the mother had a history of violence and had not contacted H.K. in years.  H.K. remains there to this day.

## JURISDICTION AND VENUE

19.    This Court has subject-matter jurisdiction under 28 U.S.C. §§1331, 1343, 42 U.S.C. § 1983, and the Fourteenth Amendment to the United States Constitution.

20.    Venue is proper in the Billings Division of this Court.  L.R. 3.2(b).

## PARTIES

21.    Plaintiff Todd Kolstad resides in Valley County, Montana, and has resided there at all times pertinent to this action.

22.    Defendant Cyndi Ballargeon is, and at all times pertinent to this action has been, employed as a Child Protective Specialist (CPS) by the Montana

Department of Health and Human Services.  Upon information and belief, Plaintiff

Kolstad alleges that Defendant Ballargeon resides in Valley County, Montana.

Defendant Ballargeon is sued in her individual capacity.

23.    Defendant Crystal Whitmore is, and at all times pertinent to this

action has been, employed as a CPS Supervisor by the Montana Department of

Health and Human Services. Upon information and belief, Plaintiff Kolstad alleges

that Defendant Whitmore resides in Valley County, Montana.  Defendant

Whitmore is sued in her individual capacity.

## STATEMENT OF FACTS

**A.    Plaintiff Kolstad's Family Background**

24.    Plaintiff Todd Kolstad and his ex-wife, Christine Kraemer, are the

birthparents of H.K., their fifteen-year-old daughter.

25.    The couple resided in Flathead County until they divorced in 2017.

26.    Kraemer subsequently moved to Canada.

27.    H.K. remained with Todd, who subsequently married Krista

Cummins-Kolstad and moved to Glasgow, Montana, in 2021.[2]

---

[2] Plaintiff Todd Kolstad and Krista Cummins-Kolstad are referred to
collectively as "the Kolstads" when warranted by the context, and "Todd" and
"Krista" when referred to separately.

B.    **H.K.'s Hospitalization In Glasgow**

28.    On Thursday, August 17, 2023, Krista received a telephone call from the manager of Taco Shack, where H.K. had a part-time job for the summer.

29.    The manager told Krista that "Leo," Krista's "son," was late for work.

30.    Krista replied that she had a daughter, H.K., who worked at Taco Shack, but not a son.

31.    The following day, Friday, August 18, 2023, Todd and Krista told H.K. to stop working at Taco Shack and, instead, focus on the upcoming school year.  H.K. responded by yelling at her parents, resulting in her parents restricting her access to the internet.

32.    Later that day at 1:48 p.m., a Glasgow police officer called Krista after receiving a report from one of H.K.'s friends that H.K. was threatening suicide.

33.    Krista told the officer that she had been home with H.K. the entire day and that H.K.'s claims were untrue.

34.    On that evening at approximately 7:40 p.m., Defendant Baillargeon arrived unannounced at the Kolstad residence.

35.    Two of the Kolstads' friends arrived shortly thereafter to observe Defendant Baillargeon.

36.     Defendant Baillargeon noted in her report that the Kolstads' home was "clean" with "plenty of food for the family in the fridge, cabinets, pantry, and freezer downstairs."

37.     Krista explained to Defendant Baillargeon, with her friends present, that gender transitioning violated the Kolstads' religious beliefs.

38.     Defendant Baillargeon then spoke to H.K., who claimed to have ingested ibuprofen and toilet bowl cleaner around 3 p.m. that day in an attempt to commit suicide.

39.     Krista told Defendant Baillargeon that she had been home with H.K., the ibuprofen and toilet bowl cleaner had been in the same room in which Krista had been working the entire day and, therefore, H.K.'s claim was untrue.

40.     Nevertheless, at Defendant Baillargeon's suggestion, the Kolstads took H.K. to Francis Mahon Deaconess Hospital (Hospital) in Glasgow at approximately 9:00 p.m. Friday evening for observation.

41.     Defendant Baillargeon accompanied them in a separate vehicle.

42.     Upon arrival, H.K. told Hospital staff that "the main issue" between her and her parents was that they disapproved of her identifying as a male.

43.     Blood tests performed by the Hospital showed no signs of poison or ibuprofen in H.K.'s system.

44.     H.K. has had a history of compulsive lying.  This includes lying about having terminal cancer as well as experiencing the death of a sibling.

45.     The Hospital admitted H.K. for observation and provided "1:1 staffing" for her, meaning that, at all times, there was at least one nurse assigned solely to observing H.K.

46.     At 10:38 p.m. that evening, a CPS supervisor wrote in a report that "immediate danger is NOT identified at the initial contact, or subsequent contacts, with the child and/or parents."

47.     A true and correct copy of this report is attached as **Exhibit 1**.

48.     The Kolstads went home for the evening.  Krista returned the next morning on Saturday, August 19, and discovered that Hospital staff had been addressing H.K. as "Leo," referring to her with male pronouns, and discussing "top surgery" with her.

49.     After Krista asked a nurse to refer to H.K. by her given name, the nurse yelled to Hospital staff to "get this young man a banana split desert."

50.     Another nurse told Krista to be more respectful of H.K.'s wishes to be referred to as a male and be called "Leo."

51.     Krista informed Hospital staff that their actions violated the law, prompting the Hospital to consult with an attorney.

52.    Hospital staff later told Krista that because they were not providing surgery or hormones, they were in a "grey area of the law."

53.    Krista called Defendant Baillargeon, inquired about her rights as a parent, and objected to Hospital staff treating H.K. as male.

54.    Dr. Anne Millard, a Hospital physician, advised Krista that the plan of care for H.K. was to seek a referral for her to a psychiatric facility for further evaluation. Krista requested that the referral be made to a Billings facility.

55.    Dr. Millard spoke separately with H.K., who said that she did not want to go home and wished to stay at the Hospital until a bed opened in Billings. She complained that her parents did not approve of her identifying as a male and required her to participate in religious-based counseling.  H.K. also said that if she could obtain a gun, she would shoot herself.

56.    H.K. also falsely accused her father of excessive drinking.

57.    The Kolstads subsequently met with Defendant Baillargeon and Dr. Millard. They agreed that H.K. should receive a psychiatric evaluation and a referral to Billings Clinic Psychiatric Center.

58.    Dr. Millard told the Kolstads that she would also make referrals to other psychiatric facilities in Montana as well as in South Dakota and Wyoming.

59.    The Kolstads conducted a "Google" search on their phone and determined that Montana and the Dakotas required parental consent for minors to

10

receive "gender affirming" treatment, but Wyoming did not.  They objected to placement of H.K. in Wyoming due to their fears that H.K. would receive such treatment in violation of their religious beliefs.

60.     Defendant Baillargeon attempted to mollify the Kolstads by telling them "well, I am sure we will find a Montana facility so this isn't an issue and we can talk more about Wyoming if we have to cross that bridge."

61.     Dr. Millard informed Defendant Baillargeon that the Hospital could continue providing H.K. with round-the-clock, one-to-one observation until a bed opened in Billings.  Dr. Millard also told Defendant Baillargeon that there were only two people ahead of H.K. on the waiting list for Billings Clinic and that H.K would likely receive a bed on Monday or Tuesday.  Defendant Baillargeon told Dr. Millard that CPS could transport H.K. to Billings.

62.     Dr. Millard included these statements in a report she prepared on Saturday, August 19, a true and correct copy of which is attached as **Exhibit 2**. The report included the following statement:

> I checked with our staff and our administrator on-call, and everyone felt that we could continue to staff enough people for the one-to-one situation this patient is currently in until a bed is available in Billings. There are only 2 people [ahead of] patient and they felt a bed would be available Monday or Tuesday. CPS said that they could transport the patient.

**Exhibit 2** at 4.

63.    On Sunday, August 20, 2023, Defendant Baillargeon asked Krista to sign an "In-Home Protection Plan" because of concerns that the Kolstads would not be able to transport H.K. once a bed became available in Billings.

64.    A true and correct copy of the plan is attached as **Exhibit 3.**

65.    The plan stated that "H.K. is suicidal and needs acute psych care. Parents are in agreeance with this however are unsure if they will be able to transport."

66.    The plan further stated that the Hospital would "provide for the care and safety of HK" on a "24/7" basis.

67.    Krista and Defendant Baillargeon both signed the plan on August 20.

68.    Dr. Millard visited H.K. again on the morning of Monday, August 21. She noted in her report for that day that H.K. is "doing well" and "feels safe at [the] hospital."

69.    A true and correct copy of this report is attached as **Exhibit 4**.

70.    As Dr. Millard noted in her report, Billings Clinic stated that morning that two patients remained on their waiting list ahead of H.K.  Other psychiatric facilities, however, had five or more patients on their waiting lists ahead of H.K. Dr. Millard informed the Kolstads that placement of H.K. at Billings Clinic remained the plan of care.

71.    Dr. Millard also noted in her report that she, Defendant Baillargeon, and H.K.'s parents had agreed on H.K.'s plan of care and that CPS was "willing to take patient to inpt psych if parents are unable to."

72.    Later that day, one of H.K.'s nurses wrote the following in her report:

> Still awaiting placement in Billings for pt. per Dr. Millard and family's request. Dr. Millard relaying plan of care for placement to pt. family. Plan is still to have family transport to Billings inpt. Psyche when bed available. Pt. up in halls with 1:1 staffing, very polite to staff, appearing comfortable communicating needs to staff.

## C.    Defendants' Warrantless Seizure of H.K.

73.    Dr. Millard visited with H.K. on the morning of Tuesday, August 22.

74.    H.K. told Dr. Millard that she would commit suicide if returned home, but that she "feels safe in the hospital," and was not planning to commit suicide, which she described as a "big improvement."  She asked Dr. Millard questions about whether the facility she would be going to would enable her to keep up with school work, as she wanted to keep straight "A's" and had plans to obtain degree in information technology after high school and work in cyber security.

75.    Dr. Millard included these statements in the report she prepared on August 22, a true and correct copy of which is attached as **Exhibit 5**.  She also noted the following in that report:

Medically, Leo is stable. He states that the Fluoxetine is helping significantly with suicidal thoughts. Patient will remain 1:1 status until discharge. Will call Billings later today for update. _Patient is not an active threat to self at this time_, but would become so if we were to send him home. Patient has been very appropriate with staff.

(emphasis added).

76.     The Kolstads did not plan to take H.K. home from the Hospital and did not give Defendants any indication that they would do so.

77.     Later that morning, Billings Clinic informed Dr. Millard that there was no bed available but that H.K. had moved to the top of the waiting list and a bed would likely be available on the following day.

78.     Moments earlier, at 10:40 a.m., Shodair Children's Hospital in Helena, Montana, notified the Hospital that a bed was available for H.K.

79.     The Kolstads would have accepted the bed at Shodair had they been informed of it.

80.     At 2:25 p.m., Shodair notified the Hospital that the bed was no longer available but suggested checking again the next day.

81.     Monument Health Behavioral Health Center in Rapid City, South Dakota, notified the Hospital at 2:21 p.m. that it "may have beds available" and that the Hospital was "welcome" to send a packet with H.K.'s information.

82.     The Kolstads would have accepted a bed in Rapid City had they been informed of it.

83.    At approximately 7:30 p.m. on Tuesday evening, August 22, Dr. Kevin Ross, a Hospital physician, called the Kolstads at their home and told them that a psychiatric facility in Wyoming had an opening for H.K.

84.    Dr. Ross did not identify the facility or tell the Kolstads where in Wyoming it was located.

85.    The Kolstads told Dr. Ross that they objected to H.K. being placed at the Wyoming facility due to the risk that she would be given transgender treatment.

86.    Approximately 15 minutes after that call, Defendant Baillargeon and a police officer arrived at the Kolstads' home. Defendant Baillargeon served on the Kolstads a document entitled "Notification to Parent" stating that CPS had removed H.K. from their custody.

87.    A true and correct copy of the Notification is attached as **Exhibit 6**.

88.    The Notification listed the names of both Defendant Baillargeon and Defendant Crystal Whitmore, Baillargeon's supervisor, as persons responsible for H.K.'s seizure.

89.    Defendant Baillargeon told the Kolstads that law enforcement would be notified if they attempted to communicate with H.K. and that CPS would take her to Wyoming.

90.     The Kolstads protested that Wyoming permitted "gender affirming" care to be given to H.K.

91.     Defendant Baillargeon instructed Hospital staff to contact law enforcement if the Kolstads attempted to communicate with H.K.

92.     The following morning, a CPS employee transported H.K. to Wyoming Behavioral Institute in Casper, Wyoming.

**D.      The State Court's Reliance Upon Defendants' False Affidavit**

93.     On August 24, Defendant Baillargeon executed a document entitled "AFFIDAVIT IN SUPPORT OF PETITION FOR EMERGENCY PROTECTIVE SERVICES ADJUDICATION OF THE CHILD AS A YOUTH IN NEED OF CARE, AND TEMPORARY LEGAL CUSTODY."

94.     A true and correct copy of this document, hereinafter referred to as the "Affidavit," is attached as **Exhibit 7**.

95.     Defendant Baillargeon stated in the Affidavit that the Kolstads "physically neglected" H.K. because they "refused to sign paperwork for HK to receive the care that was recommended by medical professionals." **Exhibit 7** at 3.

96.     She also stated in the Affidavit that:

> The child is at _imminent risk of physical harm_ due to the following reasons: HK is suicidal, and Birth Father and Stepmother refused to sign paperwork to allow her to get the psychiatric care recommended, believing that HK's behavior is attention seeking.

16

**Exhibit 7** at 10 (emphasis added).

97.    Defendant Baillargeon stated further in the Affidavit that "Due to emergent nature of this case, no additional efforts could be made to prevent removal of the child." **Exhibit 7** at 12.

98.    Defendant Baillargeon knew these statements were false.  When Defendants seized H.K. on August 22, Baillargeon knew that H.K. was safely under 24-hour, one-to-one observation at the Hospital and that the Hospital intended to continue providing such protection until a bed opened at Billings Clinic.

99.    Defendant Baillargeon omitted all of Dr. Millard's reports from the Affidavit.  She also omitted all references to the Kolstads' religious objections to transgenderism.

100.    Defendant Whitmore knew of the Affidavit's false statements and omissions but nevertheless approved the Affidavit.

101.    Defendant Baillargeon provided the Affidavit to the State, which used it to prepare a document entitled "PETITION FOR EMERGENCY PROTECTIVE SERVICES, ADJUDICATION OF CHILD AS YOUTH INNEED OF CARE, and TEMPORARY LEGAL CUSTODY."

102.    A true and correct copy of this document, hereinafter referred to as the "Petition," is attached as **Exhibit 8**.

103.    The Petition stated that there was "probable cause to believe the above-named youth is, or is in danger of being, abused and/or neglected within the meaning of Mont. Code Ann. § 41-3-102, *by reason of the facts as more particularly stated in the CPS affidavit ("the Affidavit") which is incorporated herein by this reference*." **Exhibit 8** at 2 (emphasis added).

104.    The State described the alleged physical neglect as follows:

> The cause, as far as is possible to ascertain, are allegations of Physical Neglect – the Youth was suicidal and needed acute psychiatric care and the Birthfather and Stepmother refused to sign paperwork for the Youth to receive the care that was recommended by the medical professionals; *all as more particularly described in the affidavit*.

**Exhibit 8** at 3. (emphasis added).

105.    The State filed both the Affidavit and the Petition in state court on August 25, 2023.

106.    The state court entered an order later that day entitled "ORDER GRANTING EMERGENCY PROTECTIVE SERVICES, ORDER TO SHOW CAUSE, NOTICE OF SHOW CAUSE HEARING, AND APPOINTING COUNSEL AND CASA."

107.    A true and correct copy of the order is attached as **Exhibit 9**.

108.    The state court based its order on the Affidavit's false statements:

> There is probable cause to believe that above-named child is, or is
> in danger of being, abused and/or neglected within the meaning of
> Mont. Code Ann. § 41-3-102, and further that Immediate protection
> of the child is required; and that *this finding is supported by the
> facts set forth in the supporting affidavit to the petition*.
>
> …
>
> [Child Family Services] made reasonable efforts to prevent or
> eliminate the need for the child's emergency removal from the
> home, including investigating the CI reports received regarding this
> child, however, at the time of the child's removal, due to the
> emergent need for placement, no other efforts could have been
> made to make it possible for the child to safely remain in the child's
> home, and *this finding is supported by the facts set forth in the
> supporting affidavit to the petition*.

**Exhibit 9** at 2 (emphasis added).

109.    The order also included the following finding:

> The child's removal was necessary because continuation in the home
> would be contrary to the welfare of the child and an out-of-home
> placement is in the best interests of the child due to the following nature
> of the abuse and/or neglect that placed the child in immediate or
> apparent danger of harm: *Physical Neglect as stated in the Affidavit*.

**Exhibit 9** at 2 (emphasis added).

### E.    Defendants' Demands That the Kolstads Accept H.K.'s Male Identity

110.    After CPS took H.K. to Wyoming Behavioral Institute, H.K. wrote a

letter to a friend dated September 1, 2023. In that letter H.K. stated that "I'm for

sure not going home. My DFS [*sic*] worker already decided that."

111.    H.K. also stated in the letter that she was given "men's products," that "most of the staff here are gay asf [*sic*]," and that "I have yet to meet one straight kid here."

112.    On September 18, 2023, H.K. told Defendant Baillargeon that H.K.'s biological mother, Christine Kraemer, had accepted that H.K. is transgender.

113.    Defendant Baillargeon began making efforts to have H.K. sent to Canada to live with Kraemer, even though Defendant Baillargeon knew Kraemer had a history of violence and had not seen H.K. in nearly seven years.

114.    The Kolstads had no say as to H.K.'s discharge date from Wyoming Behavioral Institute or what her subsequent destination would be.

115.    Defendants transferred H.K. from Wyoming Behavioral Institute to a group home in Billings, Montana, on September 25, 2023.

116.    The following day, the Kolstads asked Defendant Baillargeon to request that H.K. be referred to by her birth name and female pronouns.

117.    Defendant Baillargeon rejected that request and, instead, authorized the group home to provide H.K. with male haircuts, chest binders, and male hygiene products and allow her to participate in boy groups at the group home. Defendant Whitmore approved of these actions.

118.    The Kolstads sent another email to Defendant Baillargeon and Defendant Whitmore on October 2, 2023, in which they stated the following:

…[W]e are directing that [H.K.] be called by her given name and referred to as she/her. Further we want to make sure any psychiatric/psychological care is not given that transitions her "behind our backs." I am willing to discuss our understanding of this bill if it does not line up with YOUR understanding... You have had past meetings and excluded us or "not told us" a meeting was going to happen. As [H.K.]'s parents we have rights that need to be respected.

119.  Defendants Baillargeon and Whitmore refused this request and, instead, conducted a "Treatment Team Meeting" on October 10, 2023, with the goal of aiding H.K to "accept[ ] her chosen gender."

120.  On October 17, Rosalie Nelson, who was appointed by the state court as H.K.'s guardian ad litem, conducted an inspection of the Kolstads' home.

121.  At the conclusion of the inspection, Nelson handed the Kolstads a pamphlet entitled "How Parents Can Support Their Transgender Teens."

122.  A true and correct copy of this pamphlet is attached as **Exhibit 10**.

123.  Nelson told the Kolstads that, if they refused to accept H.K.'s transgenderism, they would not like what she would write about them in her report to the state court.

124.  On November 7, 2023, the Kolstads participated in a family therapy session with H.K. at the group home in Billings.

125.  A therapist who attended the meeting, Josh Berst, believed the meeting went so well that he asked Defendants to allow the Kolstads to take H.K. out to dinner, but Defendants denied this request.

126.    The state court conducted a hearing on the Petition on December 4, 2023.  The court had previously set the hearing for September, then continued it to November, then continued it again to December 4.

127.    The public defenders representing the Kolstads did not object to these continuances, challenge any of the Affidavit's false statements and omissions, or present any evidence at the hearing on December 4.

128.    As a result, the state court found that H.K. was a "Youth in Need of Care" who had been removed from the Kolstads by Defendants "under emergency circumstances" on August 22, 2023.

129.    A true and correct copy of the state court's findings, which the state court issued on December 19, 2023, is attached as **Exhibit 11**.

130.    The state court further found, based on the Affidavit, that the Kolstads had allowed H.K. to be exposed to "an unreasonable physical risk" because they "refused to sign paperwork for the Youth to receive the care that was recommended by medical professionals."  **Exhibit 11** at 4.

131.    The public defenders advised the Kolstads to "not fight the system" in order to regain custody of H.K.

132.    On December 21, 2023, Todd was permitted to spend a few moments alone with H.K. at the group home.

133.   During that time, H.K. admitted to her father that she lied often because she was not mentally well.  H.K. asked her father for forgiveness, said that she was "trying to get it under control and do better," and that she loved her father and step mother and wanted to return home.

134.   On January 25, 2024, the state court granted Defendants authority to place H.K. with her biological mother in Canada.  The court also set a treatment plan hearing for the Kolstads for January 29, 2024.

135.   On January 26, 2024, the Kolstads and their public defenders participated in a Zoom conference that included Valley County Attorney Dylan Jensen and Defendant Whitmore.

136.   During that conference, Defendant Whitmore told the Kolstads that, as a condition of reunification with their daughter, they would be required to participate in marriage counseling and accept H.K.'s transgenderism.

137.   The Kolstads stated that their marriage was fine and they did not accept the State's claim that H.K. was now a male.

138.   Jensen and Defendant Whitmore both laughed and told the Kolstads "you don't understand.  You have to accept the services."

139.   Both Defendants accompanied H.K. on a flight to Detroit on February 4, 2024, and handed H.K. over to her biological mother.

140.   H.K. was then taken to Canada.

141.   The State filed a motion to dismiss the Petition on February 15, 2024.

142.   The state court granted the motion on February 20, 2024.

143.   H.K. remains in Canada with her biological mother.

## CAUSES OF ACTION

## COUNT I

**VIOLATION OF PLAINTIFF KOLSTAD'S FOURTEENTH AMENDMENT RIGHT TO CARE, CUSTODY, AND CONTROL OF HIS DAUGHTER (42 U.S.C. § 1983)**

144.   All previous paragraphs are hereby incorporated as though fully stated herein.

145.   "[P]arents have a well-elaborated constitutional right to live with their children that is an essential liberty interest protected by the Fourteenth Amendment's guarantee that parents and children will not be separated by the state without due process of law except in an emergency." *Kirkpatrick v. County of Washoe*, 843 F.3d 784, 788-89 (9th Cir. 2016), quoting *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000). That right "includes the right of parents to make important medical decisions for their children…." *Wallis,* 202 F.3d at 1141; see also *Mann v. County of San Diego*, 907 F.3d 1154, 1162 (9th Cir. 2018) ("parental consent is critical in medical procedures involving children because children rely

on parents or other surrogates to provide informed permission for medical procedures that are essential for their care.").

146.   Under federal law that was clearly established on August 22, 2023, "seizing a child without a warrant is excusable only when officials have reasonable cause to believe that the child is likely to experience serious bodily harm in the time that would be required to obtain a warrant." *Kirkpatrick*, 843 F.3d at 790, quoting *Rogers v. County of San Joaquin*, 487 F.3d 1288, 1295 (9th Cir. 2007); *Keates v. Koile*, 883 F.3d 1228, 1238 (9th Cir. 2018) (warrantless seizure of hospitalized teenage girl experiencing suicidal ideations held unconstitutional because she was not at imminent risk of serious bodily harm).

147.   Plaintiff's daughter H.K. was hospitalized in Glasgow, Montana, on August 18, 2023, after claiming to experience suicidal ideations.

148.   The Hospital placed H.K. on 24-hour, one-to-one observation.

149.   Defendants, the Hospital, and the Kolstads agreed that (1) H.K would be referred to Billings Clinic for a psychiatric evaluation, (2) CPS would be willing, if needed, to transport H.K. to Billings once a bed opened up, and (3) H.K. would receive round-the-clock, one-to-one observation until a bed opened in Billings.

150.   Billings Clinic informed the Hospital on Saturday, August 19, that there were two persons ahead of H.K. on the Clinic's waiting list and that a bed would likely be available on Monday or Tuesday.

151.   On the morning of August 22, 2023, Dr. Millard reported that H.K. "is not an active threat to self at this time…."

152.   Later that day, Billings Clinic told Dr. Millard that H.K. had moved to the top of the waiting list for a bed and that a bed would likely be available the following day.

153.   On the evening of August 22, a Hospital physician told the Kolstads that a Wyoming facility had an opening for H.K. but did not identify which one or the city in which it was located.

154.   The Kolstads refused to agree to H.K.'s placement in Wyoming.

155.   Approximately 15 minutes later, Defendants notified the Kolstads that they had seized H.K. and would take her to Wyoming the next day.

156.   At the time they seized her, Defendants knew that H.K. was not in any danger of serious bodily harm.

157.   Defendants' warrantless seizure of H.K. violated Todd's right under the Fourteenth Amendment to care, custody, and control of H.K.

158.   As a result of Defendants' violation of Todd's constitutional right to due process, he has suffered damages including, but not limited to, humiliation,

pain and suffering, and severe emotional distress as a result of the outrageous acts

committed against him by Defendants.

## COUNT II

**VIOLATION OF PLAINTIFF KOLSTAD'S FOURTEENTH AMENDMENT
RIGHT TO CHILD REMOVAL PROCEEDINGS FREE FROM JUDICIAL
DECEPTION
(42 U.S.C. § 1983)**

159.   All previous paragraphs are hereby incorporated as though fully stated

herein.

160.   As part of the Fourteenth Amendment's right to familial association,

"parents and children have a right to be free from judicial deception in child

custody proceedings and removal orders." *David v. Kaulukukui*, 38 F.4th 792, 800

(9th Cir. 2022), quoting *Greene v. Camreta*, 588 F.3d 1011, 1034 (9th Cir. 2009),

*vacated in part on other grounds*, 563 U.S. 692 (2011).

161.   Judicial deception occurs when (1) a misrepresentation or omission,

(2) made deliberately or with a reckless disregard for the truth, was (3) material to

the judicial decision. *David*, 38 F.4th at 801.

162.   The right of parents to child removal proceedings free from judicial

deception was a matter of clearly established federal law on August 25, 2023.

163.   On August 25, 2023, Defendants filed the Affidavit in state court.

164.   Defendant falsely stated in the Affidavit that the Kolstads "physically neglected" H.K. and that she was "at imminent risk of physical harm."

165.   Defendants knew that H.K. was not suffering physical neglect or facing imminent risk of physical harm when they seized her.  They knew that H.K. had been under 24-hour observation and safely awaiting transportation to a psychiatric facility in Billings.

166.   Days before Defendants seized H.K. on August 22, Dr. Anne Millard had "checked with [Hospital] staff and our administrator on-call, and everyone felt that we could continue to staff enough people for the one-to-one situation [H.K.] is currently in until a bed is available in Billings."  **Exhibit 2** at 4.  Defendants knew of this arrangement and had agreed to provide transportation to Billings once a bed became available for H.K.

167.   Defendant Baillargeon and Krista signed an agreement on August 20 acknowledging that the Hospital would "provide for the care and safety of HK" on a "24/7" basis.

168.   Only a few hours before Defendants seized H.K. on August 22, Dr. Millard reported that H.K. was "not an active threat to self at this time…." **Exhibit 5.**

169.   Defendants omitted all of Dr. Millard's reports from the Affidavit they filed in the state court.

170.    Defendants' false claims made in the Affidavit about H.K. being "physically neglected" and at "imminent risk of physical harm" were material to the state court's rulings.

171.    In its order issued on August 25, the state court found probable cause to believe that H.K. suffered "physical neglect," a finding that was "supported by the facts set forth in the supporting affidavit to the petition."  **Exhibit 9** at 2.

172.    The state court further found that Defendants "made reasonable efforts to prevent or eliminate the need for the child's emergency removal from the home," and that "due to the emergent need for placement, no other efforts could have been made to make it possible for the child to safely remain in the child's home."  These findings were "supported by the facts set forth in the supporting affidavit to the petition."  **Exhibit 9** at 2.

173.    The state court also found H.K. was in "immediate or apparent danger of harm" because of "Physical Neglect as stated in the Affidavit."  **Exhibit 9** at 2.

174.    The state court could not have made these findings absent the false statements Defendants had included in the Affidavit.

175.    Moreover, Montana law made Defendants' omissions concerning the Kolstads' religious beliefs material as well.  Montana's definitions of "abuse" and "neglect" include the following religious-based exception:

> This chapter may not be construed to require or justify a finding of child abuse or neglect for the sole reason that a parent or legal guardian, because of religious beliefs, does not provide adequate health care for a child. However, this chapter may not be construed to limit the administrative or judicial authority of the state to ensure that medical care is provided to the child when there is imminent substantial risk of serious harm to the child.

Mont. Code Ann. § 41-3-102(4)(b).

176.    Because Defendants seized H.K. due to the Kolstads' refusal to consent to her placement in Wyoming, and because that refusal was based upon their religious beliefs, Defendants' seizure of H.K. required a showing of "imminent substantial risk of serious harm to [H.K.]."  Mont. Code Ann. § 41-3-102(4)(b).

177.    Defendants knew that H.K. was not facing an imminent substantial risk of serious harm when they seized her on August 22.

178.    Defendants' deceit of the state court made the court's proceedings against the Kolstads a sham from start to finish.

179.    As a result of Defendants' violation of Todd's constitutional right to state removal proceeding devoid of judicial deceit, he has suffered damages including, but not limited to, humiliation, pain and suffering, and severe emotional distress as a result of the outrageous acts committed against him by Defendants.

# PRAYER

WHEREFORE, Plaintiff Todd Kolstad respectfully requests the following relief from this Court:

A. Entry of judgment against each Defendant for violating Todd Kolstad's constitutional right to care, custody, control of H.K.;

B. Entry of judgment against each Defendant for violating Todd Kolstad's constitutional right to child removal proceedings devoid of judicial deception;

C. An award of nominal, compensatory, and punitive damages against each Defendant;

D. An award of reasonable fees and costs under 42 U.S.C. § 1988;

E. Any other relief this Court deems just and proper.

DATED: May 20, 2024

Respectfully Submitted,

/s/ Matthew G. Monforton
Matthew G. Monforton, Montana Bar # 5245
Monforton Law Offices, PLLC
32 Kelly Court
Bozeman, Montana 59718

Janice Lorrah, Montana Bar #213630
PACIFIC JUSTICE INSTITUTE
P.O. Box 3571
Wilmington, Delaware 19807

## REQUEST FOR JURY TRIAL

Plaintiff Todd Kolstad hereby requests a jury trial for all issues so triable.


DATED: May 20, 2024

Respectfully Submitted,

/s/ Matthew G. Monforton
Matthew G. Monforton, Montana Bar # 5245
Monforton Law Offices, PLLC
32 Kelly Court
Bozeman, Montana 59718

Janice Lorrah, Montana Bar #213630
PACIFIC JUSTICE INSTITUTE
P.O. Box 3571
Wilmington, Delaware 19807